UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANTHONY JAMES LEGLER**, <br> Petitioner, <br> v. <br> **KAREN FLETCHER**, Acting Chief Probation Officer, <br> Respondent. | Case No. 14-cv-01497-YGR <br><br> **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Now before the Court is Anthony James Legler's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his 2012 conviction in the Superior Court of California, County of Santa Clara, for a violation of Penal Code section 228(a) (lewd or lascivious act on a child under fourteen). (Dkt. No. 1 ("Petition"); Dkt. No. 11-8 ("CT") at 391.) The Petitioner asserts several grounds for ineffective assistance of counsel, argues a jury instruction was improper, and claims cumulative prejudice. For the reasons set forth below, the Petition is **DENIED** as to all claims. In addition, no certificate of appealability will be issued.

**I.   BACKGROUND**

In an unpublished opinion addressing the Petitioner's claims on a combined direct appeal and petition for writ of habeas corpus, the state Court of Appeal set forth the following summary of facts:[1]

> At the time of the offense, Legler was married. He had two children with his wife (hereafter sometimes "the mother"), and was stepfather to two girls his wife had from a prior relationship. The two stepdaughters were 14 (older stepdaughter) and 12 (younger stepdaughter). Legler, his wife and the four children lived together in a townhome in San Jose.

---

[1] Footnotes included below within each quoted excerpt of the Court of Appeal's opinion come from the original, renumbered accordingly herein.

On the evening of June 1, 2011, Legler and the rest of the family[2] were watching television together in the living room. Legler and the younger stepdaughter were sitting next to each other on one couch, while the mother was lying on a different couch and the older stepdaughter was sitting in a chair.

The younger stepdaughter testified she was sitting on the couch with her feet on an ottoman, while Legler sat next to her, close enough so that their sides were touching. She said she did not have a blanket covering her, and she asked Legler to rub her back and her stomach as it helped her to fall asleep. As Legler was rubbing her stomach, she was "half asleep," and was not sure whether Legler was asleep or awake. Legler's hand was rubbing her stomach underneath her shirt, but his hand eventually moved lower. Eventually, she felt his hand beneath her shorts and underwear, both of which had elastic waistbands. She was surprised by this and felt uncomfortable. She said he rubbed her vagina for approximately 10 seconds. Legler did not say anything as he touched her, and then he got up and went outside to smoke. The younger stepdaughter ran upstairs to her room.

The mother testified she was asleep on the couch that evening and did not see Legler touching the younger stepdaughter. She woke up as she saw Legler and the younger stepdaughter get up off the couch at the same time. She said Legler appeared groggy as he walked to the bathroom, while the younger stepdaughter ran upstairs to her room.

The older stepdaughter testified she was awake and sitting on one of the sofas that evening. She saw Legler was initially awake, but later heard him "kind of snoring" and he appeared to be "dozing off." At the same time, she saw his hand was on the younger stepdaughter's stomach. She did not see him touch any other part of the younger stepdaughter's body, but she saw his hand move lower. She did not see Legler touch the younger stepdaughter's vagina, but she believed her sister was covered by a blanket so she could not see Legler's hand.

The following morning, the mother went upstairs and woke up the younger stepdaughter to go to school. She did not appear upset and she did not say anything about Legler touching her vagina. After school, the mother picked up the younger stepdaughter and, as they were driving home, the girl asked her mother what she would do if one of her friends had been touched inappropriately by a parent. The mother turned the car around to go report the incident to someone at the school. Before they reached the school, however, the younger stepdaughter explained that she asked the question because Legler had touched her vagina the night before. The mother drove back to their home and called the San Jose Police Department.

---

[2] The older stepdaughter and the mother believed the two younger children were also in the room, though Legler's wife was not certain where they were specifically. The older stepdaughter testified they were sitting on one of the couches, but were both asleep.

2

> Legler was not at home, so the officers who responded to the mother's call asked her to participate in a pretext phone call with him. During that phone call, Legler told his wife he was "half asleep" and was rubbing the younger stepdaughter's stomach. When he suddenly realized his hand was touching her pubic hair, he pulled away. He said he did not remember touching her vagina.
>
> Later that same day, Legler was interviewed by San Jose Police Detective Tam Truong. After being apprised of his *Miranda*[3] rights, Legler told Truong he was "half asleep" when the incident occurred, but his hand must have slipped inside the younger daughter's shorts and panties. When he realized he was touching the "top" of her pubic hair, he moved his hand away. Legler reiterated several times that he did not consciously put his hand underneath the younger stepdaughter's underwear or near her vagina.
>
> Legler testified in his own defense. He said he fell asleep while rubbing the younger stepdaughter's stomach. When he awoke, his hand was inside her panties and he felt pubic hair under his fingertips. He did not remember moving his hand there and believed the total amount of time he was in contact with her pubic hair was less than 10 seconds. He moved his hand and got up.
>
> Dr. Kasey Li testified as a character witness on Legler's behalf. Dr. Li, a surgeon at Stanford Hospital, has worked with Legler, a surgical technician, for eight to 10 years. He believed Legler is a person of good moral character and someone who is not "given to lewd conduct with children."
>
> The jury convicted Legler of one count of committing a lewd or lascivious act on a child under 14 years of age (§ 288, subd. (a)).[4] The trial court suspended imposition of sentence and placed Legler on formal probation for three years, including one year in county jail. He was awarded presentence credits totaling 129 days, consisting of 87 days of custody credit and 42 days of conduct credits. Along with various other fines and fees, Legler was ordered to pay a $129.75 criminal justice administrative fee to the City of San Jose. Legler timely appealed from the judgment (H038441).

*People v. Legler*, No. H038441, 2013 WL 5658693, at *1-3 (Cal. Ct. App. Oct. 16, 2013), *reh'g denied* (Nov. 6, 2013), *review denied* (Jan. 21, 2014). The California Supreme Court denied review and the instant Petition followed.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

[4] Legler was acquitted on one count of committing a lewd or lascivious act on a child who was 14 or 15 years old (§ 288, subd. (c)(1)), stemming from an incident involving the older stepdaughter a few days before the incident with the younger stepdaughter. Because Legler was found not guilty of that offense, we do not recount the evidence offered at trial in relation to that charge.

## II. STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1975). A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-6. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. Where constitutional error is

4

found, habeas relief is warranted only if the error at issue had a "'substantial and injurious effect' on the verdict." *Penry v. Johnson*, 532 U.S. 782, 796 (2001).

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. *See Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

## III. DISCUSSION

The Petitioner, in seeking relief, argues (a) he was deprived of effective assistance of counsel, (b) that the trial court's "unconsciousness" jury instruction was improper, and (c) that the cumulative prejudice flowing from certain of these purported errors rendered his trial unfair. The Court addresses each argument in turn.

### A. Ineffective Assistance of Counsel

The Petitioner claims he was deprived of effective assistance of counsel due to his counsel's failure to: (1) call Dr. John C. Brady II as an expert pursuant to *People v. Stoll*, 49 Cal. 3d 1136; (2) consult with a sleep disorders expert; and (3) object to the prosecutor's reliance on "quasi-psychological evidence" during her closing argument.

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id*. at 687-88, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Id*. at 105 (quotation and citations omitted). When section 2254(d) applies, "the question is not whether counsel's actions were reasonable [but] whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

### 1.  Failure to Call Dr. Brady

The Petitioner argues his trial counsel was ineffective for failing to call Dr. Brady as a *Stoll* expert to testify as to the Petitioner's lack of any predisposition for sexually deviant behavior. The Court of Appeal recounted the salient facts:

> Legler's first trial counsel, Richard Weese, had Legler undergo a psychological evaluation by Dr. John C. Brady II. Weese intended to use the evaluation: (1) to negotiate a better plea bargain; (2) as a potential mitigating factor for sentencing; or (3) as the basis for potential *Stoll*[5] expert testimony if the case went to trial. Dr. Brady's evaluation was intended to assess the following: Legler's nonsexual interests; his responses for faking, malingering, impression management and social desirability; the presence of cognitive distortions; and the presence of any signs of deviant sexual or abnormal sexual interests or paraphilic trends. Dr. Brady also employed various psychological tests to evaluate Legler's personality and compare it with identified sexual offenders, and administered three tests specific to sexual interest.
>
> In his report, Dr. Brady concluded: (1) Legler was not lying or distorting during the evaluation; (2) Legler had no psychopathic personality components consistent with pedophilic offenders; (3) Legler did not indicate he has any deviant sexual interest; (4)

---

[5] *People v. Stoll* (1989) 49 Cal.3d 1136. In *Stoll* the California Supreme Court held that a defendant charged with child molestation has the right to introduce expert testimony from a psychologist who evaluated him and determined that the defendant's character is not consistent with that of a typical child molester. (*Id*. at pp. 1152-1161.) Such evidence constitutes character evidence that tends to show that the defendant did not commit the charged crime. (*Id*. at pp. 1154-1155.)

Legler is able to control his impulses including those of a sexual nature; (5) Legler has not been diagnosed with pedophilia and is not otherwise a pedophilic offender; (6) Legler has no interest in juvenile or pre-juvenile females; and (7) Legler's actuarial profile falls in the low to zero danger area. In the final section of the report, Dr. Brady notes "Legler did inappropriately touch the victim . . ., as he told the Police Officer Trung [*sic*]." However, Dr. Brady then indicated "[i]t is quite possible that at the time . . . Legler touched this minor he was in fact in between sleep and a wakeful state; thus, he momentarily was mentally confused."

When Patrick Riggs took over Legler's defense in November 2011, prior to the preliminary examination and trial, Weese transferred all his files, including Dr. Brady's report, to Riggs. However, neither Dr. Brady, nor any other *Stoll* expert, testified at trial. After Legler was convicted, Riggs faxed a copy of Dr. Brady's report to the probation officer.

In his supporting declaration, Riggs stated one of the challenges of representing Legler was "the fact that [Legler] had made certain admissions in a 'pre text' phone call, made to him by the complaining witness doe(s) in the case. [¶] In addition[, Legler] also made what could be construed as a confession . . . to the investigating officers in the case." Riggs believed he had to minimize these "admissions and confessions" in representing Legler.

Riggs believed the report from Dr. Brady "underscored the admission and confession themes as . . . Legler had related to the doctor that he had touched the doe victims." If he called Dr. Brady, the entire report would have to be produced, "allow[ing] the jury to know of repeated admissions and confessions especially to our potential expert, creating an absurdity."

Riggs instead decided to call Dr. Li to testify on Legler's behalf because Dr. Li "had a very close working relationship with [Legler] and was in a position to offer character evidence pursuant to Evidence Code [section] 1102 for both good moral character and character evidence of lay opinion that [Legler] did not have a sexual attraction to young girls." This character witness was preferable to Dr. Brady since Dr. Li did not have knowledge of "confession or admission issues." Riggs discussed this tactic with Legler before trial and got his approval to follow this tactic.

In his supporting declaration, Legler disagrees with this last point, stating that Riggs "did not discuss Dr. Li's testimony as substituting for the testimony of Dr. Brady." Legler does not recall Riggs ever discussing the possibility of having Dr. Brady testify at all.

Appellate counsel called Riggs and asked whether he had considered calling a *Stoll* expert to testify. Riggs did not initially know what a *Stoll* expert was, but once the nature of such experts was explained to him, he stated that he had heard of them. Regardless, he believed the testimony from Dr. Li would be more persuasive than a *Stoll* expert since Dr. Li personally knew Legler and could testify regarding his good moral character.

7

> After Legler was convicted, Riggs faxed over a copy of Dr. Brady's report to the probation officer prior to sentencing. Additionally, prior to sentencing, the trial court ordered that Legler undergo an examination pursuant to section 288.1; Dr. C. Mark Patterson performed the exam, and relying on Dr. Brady's previously issued report, concluded "that [Legler] does not pose a substantial risk of future sexual offending," and "[t]here is no evidence from this evaluation that either of his stepdaughters would be threatened with physical harm if imprisonment were not imposed."

*Legler*, 2013 WL 5658693, at *11-12.

In reviewing these circumstances, the appellate court found the determination by the Petitioner's trial counsel not to call Dr. Brady was a "reasonable tactical decision." *Id*. at *12. The Court of Appeal reached this conclusion, in part, based on its finding that the Petitioner had previously admitted (in the pretext phone call with his wife, during his interrogation, and on the witness stand) to "touching the younger stepdaughter, but only being aware of touching pubic hair, at which point he withdrew his hand from her underwear." *Id*. Dr. Brady's expert report arguably went further, clearly noting that the Petitioner "did inappropriately touch the victim." *Id*. Even if it only confirmed earlier statements by the defendant, counsel could have reached a reasonable strategic determination that presenting cumulative evidence of this type would harm his client's case. Thus, the state court's finding on this question was neither unreasonable nor contrary to clearly established Supreme Court precedent. To the contrary, it is the most reasonable inference supported by the record. The Court of Appeal further reasonably found no credible evidence that trial counsel was unaware of his ability to call Dr. Brady pursuant to *Stoll*—as noted by the appellate court, his pretrial briefing specifically included reference to that case, and he ultimately called lay witness Dr. Kasey Li to offer similar testimony regarding the Petitioner's character and lack of a predisposition to sexual deviancy.

On this record, the Petitioner's claim of ineffective assistance of counsel has failed to satisfy element one—that counsel's performance fell below an objective standard of reasonableness. Accordingly, the Court of Appeal cannot be said to have adjudicated the claim improperly. The Petition on this ground fails.

### 2. Failure to Consult with a Sleep Disorders Expert

The Petitioner next argues that his trial counsel was ineffective for failing to consult with

or call a sleep disorders expert. The Petitioner suggests such an expert could have "provided the jury with objective support regarding the case's central defense," namely, that "individuals can commit actions unconsciously in their sleep," and that the Petitioner's inappropriate contact with the victim was similarly "involuntary." (Dkt. No. 15 ("Traverse") at 11.) Reviewing the relevant factual circumstances, the state appellate court found this argument unpersuasive:

> [T]here is a reasonable explanation why trial counsel failed to consult with or retain a sleep disorders expert; trial counsel had no reason to know that one might be necessary. There is no admissible evidence that [trial counsel] was ever put on notice that a sleep disorder was a viable avenue of investigation. There is no mention of a possible sleep disorder in Dr. Brady's report, nor does Dr. Brady indicate that Legler mentioned such a disorder at any point during the evaluation. Appellate counsel's declaration about what [trial counsel] said that Legler told him is hearsay.
>
> In his declaration, [trial counsel] stated that as he was preparing the case, he "reviewed the reports and interviewed [Legler] about his claim that he was asleep during the allegation relating to one of the does." [Trial counsel] believed there was conflicting evidence whether petitioner was "asleep or awake during the commission of that allegation." Accordingly, he "staff[ed] the fact pattern regarding the issue with an attorney who had extensive experience with the issue in the context of molestation cases. After this consultation [,] [trial counsel] decided that the best tactical approach for a credible presentation to a jury was to marshal the evidence before [him]." At [trial counsel's] behest, the trial court instructed the jury on unconscious acts, and [trial counsel] believed that his closing argument outlined his approach that "[i]f the jury found that [Legler] was asleep or unconsciousness [sic], then they should factor the Unconscious Act instruction into their decision for acquittal."
>
> [Trial counsel] was under no obligation to investigate Legler's supposed sleep disorder if he was never told about it. The only evidence presented was that Legler would sometimes fall asleep on the couch after a long day at work. That does not seem to describe a disorder, rather it describes a normal physiological occurrence and one within the common experience of most, if not all, jurors. At no time during the investigation of this case or during the trial did Legler relate anything that might be described as a sleep disorder, i.e., where he fell asleep and, while still asleep, did something that would normally be done by a conscious person, e.g., walking, driving, talking, eating, fondling someone's genitals, etc.
>
> Because there is no evidence that [trial counsel] was made aware that Legler claimed to have a sleep disorder, there was no basis for him to investigate that issue and explore it as a possible defense. For the same reason, Legler's right to effective assistance of counsel was not infringed by our denial of his request for fees to consult with a sleep disorders expert.

*Legler*, 2013 WL 5658693, at *14.

The Petitioner argues the Court of Appeal's factual findings were wrong, and that "it is reasonable to assume that [trial counsel] was informed of this possible defense or, at the very least, thought of it on his own." However, these factual findings may only be disturbed by this Court if they are an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." While the Petitioner puts forth an alternative interpretation of the evidence that he claims is also reasonable, he fails to demonstrate that the state appellate court's interpretation was unreasonable. And in light of those factual findings, the state court's finding of no ineffective assistance of counsel on this ground was not contrary to or an unreasonable application of clearly established Supreme Court precedent.[6]

### 3. Failure to Object During the Prosecutor's Closing Argument

Finally, the Petitioner argues his counsel was ineffective for failing to object to the prosecutor's reference to "quasi-psychological evidence" not admitted at trial during her closing argument. Again, the state appellate court summarized the relevant circumstances:

> Midway through her opening argument, the prosecutor explained: "If there's anyone here who's ever played poker you might be familiar with the phrase a tell, t-e-l-l. [¶] And what a 'tell' is, and I'm not a good poker player so I hope I can describe it accurately. . . . What a tell is, is when a person is doing something, is giving some signal unconsciously that other people are reading and they are telling—and they are telling the other people there something they don't want them to know. [¶] An example of this would be let's say every time I play poker and I have a really good hand I start biting my bottom lip. So I'm looking at my cards, I'm going like this, (indicating), because I've got a full house or a pair of

---

[6] Relatedly, the Petitioner argues he was deprived of effective assistance of counsel based on the Court of Appeal's denial of his request for appointment of a sleep disorders expert in connection with his state petition for writ of habeas corpus. This decision was not contrary to clearly established Supreme Court precedent. Generally, a defendant has "no constitutional right to an attorney in state post-conviction proceedings," unless "ineffective assistance of counsel in a post-conviction relief proceeding results in a failure to assert that there was ineffective assistance of counsel in the trial proceedings." *Hunton v. Sinclair*, 732 F.3d 1124, 1126 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 1771 (2014) (internal quotations and citations omitted). The Court finds this narrow exception inapplicable. While it is true the Petitioner sought appointment of the expert, at least in part, in order to bolster his ineffective assistance claim raised in the state habeas proceedings, the Court of Appeal's decision not to appoint such an expert did not "result[] in a failure to assert that there was ineffective assistance of counsel in the trial proceedings." Indeed, the argument was both made and rejected before the state appellate court.

> aces or something like that. [¶] I don't realize I am doing it. I don't know I am biting my bottom lip like that but all the other players at the table have picked up on my tell and when they see me biting my bottom lip they know to fold because they are going to lose their money."
>
> The prosecutor then said that Legler "has a 'tell' when he is being deceptive. [¶] And . . . what his tell is, when he's lying, and this happened over and over in his conversation with Detective Truong and also it happened when he was on the stand, when he is confronted with something and he is being deceptive, he is telling a lie he says the same phrase. You know, y-o-u-k-n-o-w, you know. [¶] And he especially goes back on that phrase whenever he's questioned about being asleep when he was touching [the younger stepdaughter]." The prosecutor then identified at least 10 answers to questions in which Legler used the phrase "you know" and claimed that he was lying in each of those answers. There was no objection by Legler's trial counsel throughout the course of this argument.
>
> During Legler's closing argument, his counsel briefly addressed this portion of the prosecution's argument as follows: "Now, I think—and I'm not one to throw out a lot of big words but a 'you know' can be something other than a lie, obviously. And it can be what's called an idiomatic phrase. [¶] It can be a lot of different things in grammar. [¶] And to make the responses of repeated 'you knows' for somebody who is being interrogated by police, somebody who is on a pretext call or somebody who just uses 'you know' to mock, to jibe, to say, hey, let's laugh about. It might be a system for Vegas but it is not a system for your fact finding process. And I am glad to say that, not so enamored with my particular profession at times, but what we say is not evidence. [¶] And a trite pop psychology analysis of, you know, you know, you know, you know, is not something that you should consider."

*Legler*, 2013 WL 5658693, at *6.

The Court of Appeal found that the prosecutor had permissibly argued, based on the record (e.g., the Petitioner's use of the phrase "you know" in his police interview) and "matters . . . drawn from common experience" (e.g., "the jury's common knowledge . . . in evaluating a person's credibility based on how that person responds to stress"), that the jury could reach an inference that the Petitioner was lying. *Id*. at 7-8. The record indeed reflects the Petitioner used the phrase "you know" with *extreme* frequency whenever he was questioned about his conduct at issue in the case, including throughout (1) the pretext phone call with his wife (CT at 303-316), (2) his police interview (CT at 328-368), and (3) his trial testimony (Dkt. No. 12 ("RT") at 311-339, 364-387). The following excerpts are provided by way of example:

- "Honey, I don't recall touching her vagina. Yes, I—*you know*, I mean, I recall,

11

- like, *you know*, *you know*, touching her pubic hair, and *you know*, pulling my hand back." (CT at 303 (emphasis added) (transcript of pretext call).)

- "*You know*, (inaudible) as well.  And then, *you know*, I—I don't fancy myself to uh, *you know*, trying to molest children, especially, *you know*, my own daughters that I love.  *You know*, I tried to give affection to them all.  And they're—*you know*.  I don't think of it in a sexual manner." (CT at 308 (emphasis added) (transcript of pretext call).)

- "I don't think sexual thoughts.  You know I want—all I ever wanted was to be close to them, like *you know*, Anthony and Alyssa.  And *you know*, that might be the only reason why I ever, ever kissed them on the mouth.  I never, ever, ever tried, *you know*, to kiss them in any kind of, *you know*, sexual manner, nor would I even think that.  And, *you know*, to be honest if I've made them feel that way, *you know*, it's not by intent.  *You know*." (CT at 310 (emphasis added) (transcript of pretext call).)

- "Um, apparently, um, my child feels like I—I touched her in an inappropriate manner.  Um, and having discussing it with my wife, *you know*, I mean, I almost, every night, *you know*, I sit in, *you know*, my daughter, she sleeps with me, and she asks me to rub her back or arm or something like that and *you know*, the other night (inaudible) an episode where *you know*, I was rubbing her belly, *you know*, she wanted me to rub her belly, and I was kind of falling asleep watching TV and whatnot, and then, *you know*, I felt that my hand was on, touching her pubic hair . . . under her, and *you know*, I—I pulled away.  And that's all what, *you know*, I remember.  And having a conversation with my wife, it made my daughter feel really uncomfortable and doesn't want to be around, *you know*, so I guess I could understand wanting to protect, *you know*, her.  I would want the same thing, but *you know*." (CT at 328 (emphasis added) (police interview transcript).)

- "Um, well my wife said that I touched [my stepdaughter] under her pants on her butt, but I don't recall doing it.  *You know*, sometimes, *you know*, uh, I'll hug them

12

and I'll rub, *you know*, (inaudible) my little kids, *you know*, but (inaudible) I don't feel that it's a sexual manner at all." (CT at 334 (emphasis added) (police interview transcript).)

- "No, vagina, that's fine. I can say vagina. I mean, I see vagina every day, *you know*. It's, *you know*, well, one, *you know*, I, don't think of myself to do that to my own child." (CT at 345 (emphasis added) (police interview transcript).)

- "So, *you know*, when you give someone a hug and rub their bottom or rub their back. . . . But, *you know*, to display some affection, *you know*. Like a vigorous rubbing, not some caressing of buttocks, *you know*, or sometimes smacking. *You know*, like when you give a little spank, like, *you know*, they are kids." (RT at 316 (emphasis added) (trial transcript).)

- "I wouldn't say it went down her pants because her sweatpants were loose and I was rubbing her back. And, *you know*, the part of her buttocks that, *you know*. . . ." (RT at 366 (emphasis added) (trial transcript).)

- "By rubbing her back and buttocks her loose sweatpants may have, *you know*, *you know*, my hand may have passed underneath it but not intentionally." (RT at 366 (emphasis added) (trial transcript).)

- "*You know*, I recall—I mean, that moment in time was quite surreal. *You know*, from her telling me that I had touched Kiara on her vagina, *you know*, I—I couldn't believe, and, *you know*, things just running through your head trying to imagine what had happened. *You know*, *you know*, I couldn't say that I was, *you know*, all together there." (RT at 379 (emphasis added) (trial transcript).)

- "Well, I would expect that she would always wear underwear. And, *you know*, again, when I woke, *you know*, I'm assume [*sic*] by feeling her pubic hair that I was inside her underwear." (RT at 381 (emphasis added) (trial transcript).)

Moreover, while he did not specifically object to the prosecutor's statements in question, trial counsel did appropriately respond and attempt to undercut the prosecutor's argument during his own closing argument, as summarized above. The Petitioner claims it was nevertheless

1  inappropriate for the prosecutor to refer to this as a poker "tell" suggesting he was lying and that
2  defense counsel's failure to object constituted ineffective assistance of counsel.  However, it does
3  not appear that the prosecutor's conduct was inappropriate in the first instance.  For example, in
4  the primary case relied upon by the Petitioner for this point, *People v. Kirkes*, 39 Cal. 2d 719, 723-
5  24 (1952), the California Supreme Court found a prosecutor's reference to his opinion of the
6  defendant's guilt at the *outset* of a case, divorced of reference to any admitted evidence, to be
7  inappropriate.  In contrast, in the underlying case at issue here, the prosecutor's opinion that the
8  Petitioner had lied—expressed during closing argument—was explicitly premised upon evidence
9  introduced at trial and the common experience and knowledge of the jury regarding credibility
10 determinations.  Because the Petitioner has not identified any clearly established Supreme Court
11 precedent justifying the disturbance of the state court's findings, the claim on this ground is also
12 denied.

### B.   "Unconsciousness" Jury Instruction

The Petitioner argues the trial court's jury instruction on unconsciousness was improper. The Court of Appeal summarized the relevant circumstances as follows:

> Legler's defense was that he touched the younger stepdaughter while he was asleep and that he was therefore legally unconscious. His version of the incident was mostly consistent throughout his pretrial statements as well as his testimony at trial.  Essentially, Legler said he did not remember placing his hand on or near the younger stepdaughter's vagina, and when he realized his hand had slipped and was touching her pubic hair, he moved it.  The younger stepdaughter was not aware if Legler was asleep, but his wife stated that he appeared groggy when he got up from the couch, and the older stepdaughter testified that Legler was "kind of snoring" and was "dozing off" when the incident occurred.
>
> In light of this evidence, the trial court instructed the jury on legal unconsciousness with the following tailored version of CALCRIM No. 3425: "The defendant is not guilty of committing lewd and lascivious conduct if he acted while legally unconscious.  Someone is legally unconscious when he is not conscious of his actions.  Someone may be unconscious even though able to move. Unconsciousness may be caused by a blackout, sleep walking or a similar condition.  The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. [¶] If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious you should conclude that he was conscious. [¶] If, however, based on all the evidence you have a reasonable doubt that he was conscious you must find him not guilty."

> Before instructing on unconsciousness, however, the trial court instructed the jury the People had to prove "the union or joint operation of act and wrongful intent[, and] . . . [f]or you to find a person guilty of committing a lewd and lascivious act that person must not only intentionally commit the prohibited act but must do so with a specific intent."
>
> The trial court then instructed the jury on the law relating to the charged offense of committing a lewd or lascivious act on a child under 14 years of age. In those instructions, the court indicated the People "must prove that, one, the defendant willfully touched any part of a child's body either on the bare skin or through the clothing. [¶] Two, the defendant committed the act with the intent—intent of arousing, appealing to or gratifying the lust, passions or sexual desires of himself or the child. . . . [¶] . . . [¶] Someone commits an act willfully when he does it willingly or on purpose."

*Legler*, 2013 WL 5658693, at *3-4.

The Petitioner's challenge centers around the following aspect of the instructions: "If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious you should conclude that he was conscious. [¶] If, however, based on all the evidence you have a reasonable doubt that he was conscious you must find him not guilty." According to the Petitioner, that instruction was "ambiguous," suggesting "'the jury is only to consider whether there is reasonable doubt based on the other evidence if it finds that a defendant acted as if he was not conscious.'" (Traverse at 14 (quoting *People v. Mathson*, 210 Cal. App. 4th 1297, 1323 (2012)).) Thus, the Petitioner argues this instruction created an improper mandatory presumption. *See Carella v. California*, 491 U.S. 263, 265 (1989) (finding a due process violation in the case of a mandatory direction, where "the specific instruction, both alone and in the context of the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State proves certain predicate facts"). However, while the Court of Appeal in *Mathson* found the instruction "potentially confusing," it found no due process violation. *Mathson*, 210 Cal. App. at 1317. In the underlying case, the Court of Appeal found the Petitioner's jury was adequately instructed because any ambiguity caused by this portion of the instructions "was resolved by the remaining instructions given to the jury in this case," such as "the instruction on lewd and lascivious conduct [advising] the jury that [the Petitioner's] culpability was contingent upon a willful act carried out with specific intent." *Legler*, 2013 WL 5658693, at *5. Unlike in *Carella*,

15

therefore, the instructions as a whole would not have been understood by reasonable jurors to require them to reach a mandatory presumption—here, to find the Petitioner formed the requisite intent if he "acted as if he were conscious," where the jurors nevertheless maintained a reasonable doubt as to the willfulness of his conduct.  While the instruction was less than ideal, the state appellate court reasonably found that any harm was ameliorated by the other instructions given, including those discussed above and the instruction that a verdict of guilty required a finding that the Petitioner "intentionally commit[ed] the prohibited act . . . with a specific intent."  Thus, this ground for relief is also foreclosed.

### C. Cumulative Prejudice

The Petitioner also argues the cumulative prejudice resulting from the foregoing purported trial errors (regarding the jury instructions and the prosecutor's closing argument) "so undermined confidence in the verdict that reversal is necessary." (Traverse at 17.)  However, where, as here, there is not a single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  Thus, this final ground for relief is also denied.

## IV. CONCLUSION

For the foregoing reasons, Anthony James Legler's Petition for Writ of Habeas Corpus is hereby **DENIED**.  A certificate of appealability will not issue, as reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Petitioner may seek a certificate of appealability from the Court of Appeals.

**IT IS SO ORDERED.**

Dated: July 16, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**